## AFFIDAVIT OF SPECIAL AGENT JAMES D. BEDSOLE
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent James D. Bedsole, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since December 2020. I am assigned to the FBI's Boston, Massachusetts Field Office, where I investigate economic crimes, including business and securities fraud. At the FBI Academy in Quantico, Virginia, I received training in a variety of investigative and legal matters, including Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. Prior to joining the FBI, I worked for over four years as a licensed attorney in private practice, handling securities litigation and regulatory matters. In connection with my work as an attorney, I conducted numerous reviews of complex financial transactions, including in cases involving allegations of financial misconduct and fraud.

2. The facts in this affidavit come from my personal involvement in this investigation, my training and experience, other law enforcement agents, and other sources identified below. This affidavit does not set forth all of my knowledge about this matter.

### PROBABLE CAUSE TO BELIEVE FEDERAL CRIMES WERE COMMITTED

3. I submit this affidavit to establish probable cause in support of a criminal complaint charging TOCHUKWU ABEL EDEH, ▬▬▬▬▬▬ ▬▬▬▬▬▬ ▬▬▬▬▬▬ AMEN OKUNDAYE with conspiracy to commit concealment and promotion money laundering, in violation of 18 U.S.C. § 1956(h).

**General Allegations**

4. TOCHUKWU ABEL EDEH ("EDEH") is a Nigerian national who resided in Jacksonville, Florida.

5. Big T Autos LLC is a Texas limited liability company registered by EDEH. According to public records, EDEH is the manager. Big T Autos LLC purports to engage in used car sales and exports. EDEH holds bank accounts for Big T Autos LLC in Nigeria and in the United States.

6. Felsic Global LLC is a Florida limited liability company registered by EDEH. According to public records, EDEH is the manager, and the Florida company purports to engage in used car sales and exports.

7. EDEH also operated a Nigerian company, "Felsic Global Trading Ltd." Felsic Global Trading Ltd. is the parent of "CurrencyXchangers," an entity which, according to e-mails sent from EDEH's personal email account, was "a cryptocurrency and e-commerce firm" that "exchang[ed] bitcoin and perfect money . . . providing cryptocurrencies at the most competitive rates." EDEH held accounts for Felsic Global Trading Ltd. in Nigeria at Diamond Bank PLC, in account numbers ending *2104 and *2685.

8. On or about September 17, 2020, EDEH spoke with the FBI in Jacksonville and stated that he exchanges United States currency for Nigerian currency for profit.

9. ███████ is a Nigerian national who resided in Texas. According to bank records, she was self-employed.

10. OKUNDAYE is a United States citizen who resided in Texas. According to bank records, she was unemployed.

11.     CC-1 is related to EDEH.  He/she is a Nigerian national.  At all relevant times, he/she held a United States bank account using, as his/her mailing address, the business address of a soccer organization in Waltham, Massachusetts for which he/she worked, possibly as a coach.  The account records include numerous transactions consistent with his/her residence in Massachusetts.

12.     CC-2 is a United States citizen who resided in Texas.  According to bank records, he/she did business as "Global Prime."  I have reviewed CC-2's bank records and cannot currently identify any legitimate commercial activity associated with Global Prime.

13.     CC-3 is a Nigerian national who resided in Texas.  According to bank and business records, CC-3 was a data analyst.  CC-3 held a bank account jointly with CC-4.

14.     CC-4 is a United States citizen who resided in Texas.  I am not aware of CC-4's occupation.

15.     CC-5 is a United States citizen who resided in Washington.  According to bank records, he/she was a retired nurse.

16.     CC-6 is a Nigerian citizen who resided in Maryland.  According to bank records, he/she worked in financial services.

17.     According to public records, EDEH did not have a money transmitting license in Texas or in Florida, both of which require money transmitters to hold licenses and punish unlicensed money transmission as a felony.  Tex. Fin. Code §§ 151.302, 151.708; Fla. Stat. §§ 560.204, 560.111.  According to public records, ▮▮▮▮ OKUNDAYE, CC-1, CC-2, CC-3, CC-4, CC-5, and CC-6 (together with ▮▮▮▮ and OKUNDAYE, the "Conspirators") did not hold money transmitting licenses in their respective states of residence.  According to public

records, EDEH and the Conspirators did not register with the Department of the Treasury as money transmitters pursuant to 31 U.S.C. § 5330.

## The Objects of the Conspiracy

18.     The object of the money laundering conspiracy was to conceal the ownership of the proceeds of schemes to defraud small investors using purported internet investment companies and to promote the fraud schemes by transmitting funds known to have been derived from criminal activity through a network of account holders in the United States, which functioned as a money laundering business for moving funds, including cryptocurrency, within the United States and from the United States to persons and entities abroad.

## The Specified Unlawful Activity:  Wire Fraud, 18 U.S.C. § 1343

19.     The internet-based investment fraud schemes for which EDEH and the Conspirators laundered proceeds and transmitted money were perpetrated by Subjects 1, 2, 3, and 4, who are known persons in Nigeria.  Two representative schemes were PrimeFx.org and Voiceprofit.com.  In June and July, 2016, Subject 1 registered the domains and created the websites for PrimeFx and Voiceprofit, which offered victim investors extraordinary speculative returns.  PrimeFx brochures contained in Subject 1's email account stated that PrimeFx traded in binary options, foreign exchange futures, and securities.  PrimeFx promised 27.3 to 46.2 percent monthly profits in investment plans that included purported bitcoin (cryptocurrency) arbitrage.  Subject 1 and Subject 2 agreed to create Voiceprofit.com as a bitcoin specific investing fraud on or about July 8, 2016; according to documents contained in Subject 3's email account, Voiceprofit promised monthly profits from bitcoin investments of up to 50 percent.

20. PrimeFx, Voiceprofit, and other schemes involving Subjects 1, 2, and 3 used multiple online channels and aliases. For example, PrimeFx communicated with victims through Facebook, Skype, and direct email (care@primefx.org). PrimeFx directed victims to send money to the bank accounts of "exchangers" or to bitcoin wallets and sent purported investment returns to victims using wires and services like MoneyGram.

**Manner and Means of the Conspiracy**

21. The manner and means of the conspiracy were as follows:

a. EDEH acted as the hub of a network of holders of bank accounts in the United States, including the Conspirators and other persons known and unknown.

b. EDEH provided accounts and bitcoin wallets to persons perpetrating internet-based fraud schemes, including at least Subjects 2 and 4, and for a fee moved the proceeds of fraud schemes for the perpetrators of the fraud schemes.

c. EDEH also used his personal and business bank accounts in Nigeria to transfer funds to the Nigeria-based perpetrators of the fraud schemes, including Subjects 2, 3, and 4.

d. The Conspirators, and others known and unknown, received wires from victims who "invested" in fraudulent investment companies and then, after taking a fee, transferred by wire, check, or transmitting service (*e.g.*, Zelle) the victims' funds to EDEH, Big T Autos LLC, CC-1, and other co-conspirators, known and unknown.

e. EDEH, the Conspirators, and others known and unknown made "lulling payments" to victim investors using investment money from other victim investors.

f. The Conspirators also received cash deposits, wires, and transfers and, after deducting a fee, transferred money to persons and entities in the United States and abroad.

### *Overt Acts in Furtherance of the Conspiracy*

22. In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following <u>approximate</u> dates, EDEH, the Conspirators, and others known and unknown committed various overt acts in the District of Massachusetts and elsewhere, including, but not limited to, the following.

▇▇▇▇▇

23. In November 2017, Victim 1, a resident of Massachusetts, communicated with PrimeFx by email about investing in one of PrimeFx's investment funds. On November 3, 2017, a representative of PrimeFx told Victim 1 to wire his/her investment to an account held by ▇▇▇▇▇ Believing, based on PrimeFx's representations, that her/his funds would be invested in a trading pool, Victim 1 wired $5,000 to ▇▇▇▇▇ on November 6, 2017. ▇▇▇▇▇ did not invest Victim 1's money. Instead, on November 7, 2017, ▇▇▇▇▇ transferred $2,500 to CC-1 in Massachusetts, and on November 13, 2017, ▇▇▇▇▇ used Zelle to transfer $2,000 to CC-1, who on the same day transferred $4,500 to Big T Autos LLC. ▇▇▇▇▇ kept and spent $500, or ten percent, of Victim 1's investment.

24. In January 2018, Victim 2, a resident of Massachusetts, emailed with PrimeFx about investing in one of PrimeFx's investment funds. On January 3, 2018, a representative of PrimeFx instructed Victim 2 to wire his/her investment to an account held by ▇▇▇▇▇ On January 3, 2018, Victim 2 wired $15,000 to ▇▇▇▇▇ account. ▇▇▇▇▇ did not invest Victim 2's money; instead, she transferred $12,750 to EDEH on January 10, 2018. ▇▇▇▇▇ kept and spent $2,250—or 15 percent—of Victim 2's investment.

25. On April 18, 2018, ▮▮▮▮ received wires from two PrimeFx investors, totaling $10,000, but ▮▮▮▮ did not invest the money for them. Instead, on April 20, 2018, she transferred $8,970 to EDEH, who, on the same day, transferred the funds to Big T Autos LLC. In the following days, the Big T Autos LLC account made a series of small payments; then, on May 2, 2018, EDEH withdrew $3,485 and purchased a cashier's check for $3,963, payable to an unknown entity.

26. On August 23, 2018, ▮▮▮▮ received a $5,000 wire from a PrimeFx investor in California, with the memo, "Global Prime," and a second $5,000 transfer from an unknown person. The next day, ▮▮▮▮ received a $15,000 wire from a different PrimeFx investor in California, with the memo, "Global Prime, and a second $5,000 transfer from the same unknown person as the day before. On August 29, 2018, ▮▮▮▮ received a $20,000 wire from yet another PrimeFx investor in California, with the memo, "Global Prime." Having received $50,000 in transfers, ▮▮▮▮ did not invest any of the money. Instead, on August 29, 2018, she transferred $28,000 to Big T Autos LLC; on August 30, 2018, she transferred $2,000 to EDEH; on August 31, 2018, she received a transfer of $10,000 from another apparent investor in PrimeFx; and that same day, she withdrew $7,000. ▮▮▮▮ spent the remainder of the $50,000 she received between August 23 and 29, 2018. For his part, EDEH appears to have spent the $30,000 he and Big T Autos LLC received in a series of smaller expenditures, none of which appear to relate to investment of funds received from the PrimeFx investors.

27. In November 2018, at the direction of a representative of PrimeFx, Victim 3, a resident of Florida, wired $10,000 to an account held by ▮▮▮▮ with the instruction, "Global Prime." ▮▮▮▮ did not invest the money; instead, on the same day that the wire arrived,

███████ wired $10,000 to the bank account of Company A, a healthcare company located in Cambridge, Massachusetts that has operations in Africa, including in Nigeria. The Chief Financial Officer of Company A, whom the FBI has interviewed, stated that the transfer was part of a money transmitting transaction initiated in Nigeria.

28. Also in November 2018, ███████ received a $25,000 wire with the instruction, "Global Prime," from an apparent PrimeFx investor in Ohio and a $10,000 wire from Victim 3, also with the instruction, "Global Prime." ███████ did not invest the proceeds of either wire; instead, on November 8, 2018, ███████ used Zelle to transfer $2,500 to EDEH, and on November 9, 2018, ███████ transferred $31,500 to Company B, a car dealership in Texas. ███████ kept and spent $1,000 of the investment money. On January 14, 2019, Company B issued a check for $15,900 to Company A with the memo indicating that the check was for/regarding, "Edeh[,] Tochukwu." The CFO of Company A also identified this transfer as part of a money transmitting transaction initiated in Nigeria.

29. From May 2018 to March 2019, ███████ received no fewer than 35 wires from PrimeFx victims totaling at least $278,050 bearing wire instructions such as "Global Prime" or "Global Prime Investment" or "PrimeFx." ███████ did not invest any of the victim funds; instead, she retained a percentage and transferred the remainder to EDEH and co-conspirators.

**OKUNDAYE**

30. On February 13, 2017, OKUNDAYE made a cash deposit of $1,802 into her bank account in Katy, Texas. That same day, she transferred $1,656 to CC-1 in Massachusetts, apparently keeping the difference as a fee. That same day, CC-1, who had received other transfers from Texas on February 10, 2017—including one from ███████ for $1,500—wired

$6,000 to a company in China. CC-1 kept and spent the difference between the transfers from Texas and his/her wire to China.

31. On March 13, 2017, OKUNDAYE made a cash deposit of $1,150 into her bank account in Katy, Texas. That same day, she transferred $1,039 to CC-1 in Massachusetts.

32. On March 16, 2017, OKUNDAYE made a cash deposit of $1,109 into her bank account in Katy, Texas. That same day, she transferred $900 to CC-1 in Massachusetts. CC-1, who also received $450 from ▮▮▮▮▮ on March 16, 2017, wired money to a Chinese company on March 17, 2017.

33. On June 28, 2017, OKUNDAYE received a wire for $1,490 from a Canadian investor in PrimeFx, with the instruction, "Payment," and that same day, OKUNDAYE transferred $1,290 to CC-1 in Massachusetts. On June 28 and 29, 2017, CC-1 made two transfers of $800 and $200, respectively, and retained the difference.

34. In 2017 and 2018, Victim 4, a resident of Massachusetts, communicated by phone, email, and Facebook message with PrimeFx about investing in a PrimeFx investment fund and, as described below, made multiple investments.

35. On November 1, 2017, a representative of PrimeFx instructed Victim 4 to wire her/his investment to an account held by OKUNDAYE. On November 2, 2017, Victim 4 wired $19,000 to OKUNDAYE's account. OKUNDAYE did not invest Victim 4's money. Instead, in a series of transactions on November 6, 7, 8, and 13, 2017, she transferred $12,500 to CC-1 in Massachusetts. Also on November 13, 2017, OKUNDAYE transferred $4,500 to her savings account and then, on November 21, 2017, issued a check for $4,500 to Big T Autos (EDEH's company), keeping $2,000 from the investment as her fee. For his part, having received $12,500

from OKUNDAYE, CC-1 in Massachusetts transferred $8,500 to Big T Autos LLC on November 9 and 13, 2017, and spent the remainder.

36. On November 24, 2017, OKUNDAYE received a teller transfer of $7,000 from an unknown person in Massachusetts, and on November 29, 2017, she transferred $6,300 to EDEH, keeping $700 as a fee for the transfer.

37. On February 2, 2018, a PrimeFx victim requested a withdrawal from his/her purported PrimeFx account by email to PrimeFx. On February 7, 2018, OKUNDAYE received a wire for $3,000 from a Voiceprofit investor. OKUNDAYE did not invest the money; instead, on February 12, 2018, she sent $1,955 to the PrimeFx victim who had requested a withdrawal. Based on my training and experience, I understand this transaction to indicate a Ponzi-style fraud in which the deposits of later investors pay "returns" to earlier investors. I also understand this payment using an investment in Voiceprofit to pay a return to a PrimeFx victim to be a lulling payment designed to perpetuate the illusion of a bona fide investment.

38. On April 24, 2018, OKUNDAYE received in her bank account a wire for $5,000 from a PrimeFx investor. On April 26 and 27, 2018, OKUNDAYE used Zelle to transfer $2,500 and $2,000 to EDEH, who transferred $2,500 and $1,800, on April 27 and 30, 2018, to Big T Autos LLC. On May 2, 2018, $3,485 was withdrawn from the Big T Autos LLC account, and a cashier's check for $3,963 was purchased.

39. On June 8, 2018, OKUNDAYE received in her bank account a wire for $8,000 from an investment fraud victim with the wire detail, "Investment." OKUNDAYE did not invest the funds. Instead, on June 11, 2018, OKUNDAYE transferred $5,000 to EDEH, and on June 12, 2018, she transferred $2,100 to ▮▮▮▮▮▮▮. OKUNDAYE retained or spent the rest.

40. Like ▓▓▓▓▓ OKUNDAYE received numerous transfers from victim investors totaling at least $81,961, did not invest their money, and transferred the vast majority of these funds to her co-conspirators, principally to EDEH.

**<u>CC-1</u>**

41. On February 10 and 13, 2017, persons in Texas, including ▓▓▓▓▓ and OKUNDAYE, transferred $5,330 and $1,656 into CC-1's bank account, and on February 13, 2017, from Massachusetts, CC-1 wired $6,000 to a company in China.

42. On February 15 and 21, 2017, persons in Katy, Texas deposited $2,025 and $450 into CC-1's bank account.

43. On February 24, 2017, CC-3, in Texas, transferred $510 into CC-1's bank account. That same day, from Massachusetts, CC-1 wired $2,000 to an account at Guaranty Trust Bank in Nigeria.

44. On March 1, 2017, ▓▓▓▓▓ in Texas, transferred $900 into CC-1's bank account.

45. On March 2, 2017, CC-1, in Massachusetts, wired $3,000 to EDEH's account at Guaranty Trust Bank in Nigeria; based on then-current exchange rates, $3,000 was roughly equivalent to 1,000,000 Naira (Nigerian currency).

46. On March 3, 2017, EDEH received the funds in his Guaranty Trust Bank account, and on March 6, 2017, the next transaction day according to bank records, EDEH transferred funds to his currency company, Felsic Global Trading Ltd/, and sent 1,000,000 Naira to Subject 2 (who created Voiceprofit with Subject 1 and apparently ran Voiceprofit with Subject 3).

47. On March 20, 21, 22, 23, and 27, 2017, OKUNDAYE, in Texas, transferred $2,000, $500, $1,000, $2,000, and $1,500, respectively, to CC-1, and on March 28, 2017, an unknown person transferred $2,500 to CC-1.

48. On March 29, 2017, CC-1, in Massachusetts, wired $7,000 to the Nigerian bank account of a Nigerian entity, which, based on publicly available records, purports to be a vendor of goods.

### CC-2

49. On November 27, 2017, CC-2 opened a bank account at Regions Bank in Texas, doing business as "Global Prime," with a deposit of $100.

50. On December 19, 2017, CC-2 received a wire from an investment fraud victim in North Carolina, with the wire instruction, "Investment," but CC-2 did not invest the victim's funds.

51. On December 19, 2017, a PrimeFx victim in Canada emailed PrimeFx to notify PrimeFx that she/he would deposit money into her/his PrimeFx account, and on December 20, 2017, CC-2 received a wire to "Global Prime" from the Canadian PrimeFx victim.

52. On December 23, 2017, PrimeFx emailed the Canadian victim to confirm receipt in CC-2's Regions Bank account.

53. On December 22 or 23, 2017, Victim 4 emailed PrimeFx to request a withdrawal of $4,000 from her/his PrimeFx account.

54. On December 27, 2017, CC-2 wired $4,000 from his/her Regions Bank account in Texas to Victim 4's bank account in Massachusetts. Based on the funds in CC-2's account, the source of the purported withdrawal paid to Victim 4 was funds from the victim in North Carolina

or the victim in Canada.  Based on my training and experience, I understand that paying earlier investors with deposits from later investors is a hallmark of investment fraud schemes, including "Ponzi schemes."

55.	On February 16, 2018, CC-2 closed the "Global Prime" account at Regions Bank, withdrawing the balance of funds received from the victims in North Carolina and Canada.

### CC-3 and CC-4

56.	On June 29, 2017, PrimeFx told Victim 4, in Massachusetts, that she/he could invest in a "Beginner" investment package with a guaranteed 10 to 20 percent month return on investment or an "Advanced" investment package with a guaranteed 30 to 60 percent monthly return on investment.  PrimeFx directed Victim 4 to send her deposit to a J.P. Morgan Chase ("Chase") bank account held by CC-4 in Texas.

57.	On July 3, 2017, Victim 4 wired $3,000 to CC-4's Chase account in Texas.

58.	On July 5, 2017, CC-4 withdrew $3,300 from her Chase account.

59.	That same day, there was a $3,000 counter deposit into CC-3 and CC-4's jointly held Bank of America account, and on the same day, CC-3 transferred $2,500 to CC-1 in Massachusetts.

60.	On July 7, 2017, CC-1 wired $1,400 to Company C in China, which purports to be a hair-care product supplier.

61.	On October 13, 2017, CC-3 received a wire for $5,000 with the wire instruction "Ultimate Investment" from an investment fraud victim in Florida.  On October 16, 2017, CC-3 received a wire for $5,671 from a person in Great Britain.

62. On October 19, 2017, CC-3 wrote a check to Big T Autos LLC (EDEH's company) for $5,000.

63. On October 20, 2017, CC-3 received a wire for $4,945 from a Canadian PrimeFx victim, who sent CC-3 the money after PrimeFx told him/her to do so.

64. On October 24, 2017, CC-3 received a wire for $5,000 from Victim 5, a PrimeFx victim in Massachusetts.

65. On October 26, 2017, CC-3 wrote a check for $5,600 to a co-conspirator in Illinois, and on October 31, 2017, CC-3 transferred $595 to CC-1 in Massachusetts.

66. On December 27, 2018, CC-3 received a wire for $5,000 from an investment fraud victim in Arizona with the wire instruction, "Global Prime"; CC-3 did not invest the money but instead made multiple transfers to unknown persons and otherwise spent the money.

67. On January 14, 2019, CC-3 bought a cashier's check for $4,100 payable to Company A, the health care company in Massachusetts that had previously received funds from ▆▆▆▆▆ The CFO of Company A, whom the FBI has interviewed, stated that the moneys received from CC-3 were also part of a money transmitting transaction initiated in Nigeria.

### CC-5

68. Subject 2, who created Voiceprofit with Subject 1, possessed in his/her personal email account an image of text exchange on or about June 30, 2018 in which the first correspondent asks, "Ok what is going to be deposited in [the] account, how much, who is it comi[ng from] and what am I to do with it?" The second correspondent answered, "Ok it is [CC-5's Wells Fargo account]."

69.     On August 27, 2018, CC-5's Wells Fargo account received a wire for $5,000 from a person who joined PrimeFx as a customer on August 26, 2018.  CC-5 did not invest the money; instead, on August 27, 2018, he/she withdrew $4,965.

70.     On September 5, 2018, CC-5's Wells Fargo account received a wire for $15,000 from a PrimeFx investor, Victim 5, who was a resident of Massachusetts.  That same day, CC-5 also received a wire for $5,000 from an unknown person, and on that same day, CC-5 withdrew $8,500 in cash and, separately, wired $7,000 to EDEH.

**CC-6**

71.     On July 9, 2018, by email, PrimeFx told a new investor from California to send his/her initial investment to an account held by CC-6 and told the new investor, "Key; Reason for deposit should be stated, 'Global Prime.'"  At PrimeFx's direction, the new investor wired $10,000 to CC-6's account on that same day, but CC-6 did not invest the funds.  Instead, on July 10, 2018, CC-6 wrote a $6,500 check to himself/herself.

72.     On July 11, 2018, CC-6 received a wire from a PrimeFx investor in Rhode Island, with the memo, "Global Prime."

73.     On July 13, 2018, CC-6 received a wire and a transfer totaling $10,000 from the California investor who previously sent money on July 9, 2018; CC-6 also received a wire for $5,000 from another PrimeFx investor from California, with the memo, "Global Prime."  CC-6 did not invest the money for any of these victims; instead, on July 13 and 16, 2018, he/she wrote a $15,500 check and a $8,008 check, both to himself/herself.  Bank records show that on July 16, 2018, EDEH (through his company, Big T Autos) deposited checks for $22,000 from CC-6.  EDEH did not invest the money; rather, he spent the money and made a few small transfers.

**EDEH**

74. As early as December 2015, EDEH transferred Naira from a Nigerian bank account to Subject 1.

75. As early as January 2016, EDEH transferred Naira from a Nigerian account to Subject 3; EDEH made additional transfers to Subject 3 in 2016, 2017, and 2018.

76. By at least September 21, 2016, EDEH moved money from/for PrimeFx. For example, on September 21, 2016, PrimeFx emailed a victim investor that his/her "payout" of $450 would come from "Abel Edeh" in Florida. That victim later invested in another PrimeFx scheme, and emails sent by the victim to PrimeFx show that when he/she tried to withdraw his/her funds in September 2017, he/she could not do so. By January 2018, the victim could no longer log into his/her PrimeFx account. The victim unsuccessfully tried to withdraw funds until at least November 2018.

77. Nigerian bank records show that EDEH began transferring funds to Subject 2 as early as December, 2016. He made additional transfers to Subject 2 in 2017; Subject 2 made transfers to Edeh in 2018 and 2019.

78. For example, on May 14, 2017, EDEH asked Subject 2 by text for an account involved in a transaction; Subject 2 responded with the account of a co-conspirator in California, with whom Subject 2 had set up another fraudulent investment company.

79. On June 1, 2017, Subject 2 sent EDEH $41,000 using Bitcoin; EDEH confirmed by text that Subject 2 had transferred $40,617.45; Subject 2 complained that EDEH had taken too large a fee based on the $41,000.

80. Later that day, EDEH told Subject 2 by text that he was sending Subject 2 millions of Naira (Nigerian currency), using both EDEH's company account and EDEH's personal account; Subject 2 asked EDEH only to transfer money from his company accounts, "[j]ust to make my bank records legitimate."

81. At all relevant times, EDEH knew that he was providing financial services to persons perpetrating internet fraud schemes. For example, in a September 22, 2016 email to himself, EDEH memorialized the name and bank account information of a money transmitter in Ohio. On October 24, 2016, EDEH negotiated a transfer with Subject 4, who offered EDEH up to 30 percent of the transaction; EDEH directed the co-conspirator to use the money transmitter in Ohio. EDEH indicated that although the Ohio money transmitter's bank account was new, the transmitter was the same person to whom EDEH had previously referred Subject 4. Subject 4 then forwarded EDEH an October 24, 2016 record of a $10,000 wire from a victim in North Carolina to the money transmitter in Ohio; the wire record contained the instruction, "Investment in Coin Securities." Bank records show that the Ohio-based money transmitter received three wires totaling $25,000 from the same victim in North Carolina from October 24, 2016 to October 31, 2016; each of the wires had the instruction, "Investment in Coin Securities." The Ohio-based money transmitter withdrew the money from his/her accounts.[1]

---

[1] Contemporaneously, the Ohio-based money transmitter also received a wire from an investment fraud victim in New York, whom I have interviewed. That wire carried the instruction, "Bitcoin Investment." The Ohio-based money transmitter also withdrew the funds sent by the New York victim. The same New York victim also sent investment money to a different money transmitter; contemporaneously, the latter money transmitter wired funds to EDEH's Ohio-based transmitter, who withdrew the funds from his/her account.

82. On October 28, 2016, Subject 4 sent EDEH an October 27, 2016 record of a $5,000 wire from the North Carolina victim to the Ohio-based money transmitter. On November 1, 2016, Subject 4 sent EDEH an October 31, 2016 record of a $10,000 wire from the same victim in North Carolina to the same Ohio-based money transmitter.  Both wire records contained the instruction "Investment in Coin Securities."  In response, EDEH complimented Subject 4, who replied, in part, "[s]ome will be paid back I'll make [M]adoff look like a kid." Based on my training and experience, I understand the co-conspirator's comment to refer to Bernie Madoff and to be an admission that the "investment in coin securities" was fraudulent.

83. On November 4, 2016, Subject 4 told EDEH to "wire 400k" to a Nigerian bank account.  Bank records for EDEH's Guaranty Trust Bank account show that on November 7, 2016, EDEH transferred 400,000 Naira to Subject 4.

84. On November 8, 2016, EDEH warned Subject 4 that the account for the Ohio-based transmitter that Subject 4 "ha[d] been using [was] currently place on hold by the bank, so further transactions should not be sent there at the moment, contact me when you wanna deal." Subject 4 responded, "But my money is still intact."  Based on my training and experience, I infer that EDEH must have communicated with his money transmitter in Ohio or have had access to the account of the Ohio-based money transmitter. I also understand EDEH to be effectively in control of the bank account at issue and engaged in an ongoing money transmitting and money laundering relationship with Subject 4, for whom EDEH was holding money.

85. As shown above, EDEH's bank records demonstrate ongoing money laundering and money transmitting relationships from at least 2016; in addition, EDEH kept and maintained

records in his personal email account that detailed amounts due to persons in the United States, such as CC-3, and to persons abroad, such as Subject 2 (via Subject 2's Nigerian company).

## CONCLUSION

86. Based upon the evidence set forth above, as well as my knowledge, training, and experience, I submit there is probable cause to believe that from at least June 2016 to the present, TOCHUKWU ABEL EDEH, ███████ ███████ and AMEN OKUNDAYE conspired to commit money laundering to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of wire fraud and to promote wire fraud, contrary to 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) and in violation of 18 U.S.C. § 1956(h).

*James Bedsole*
James D. Bedsole
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me telephonically pursuant to Fed. R. Crim. P. 4.1 this 31st day of August, 2021, at Boston, Massachusetts.

*Jennifer C. Boal*
Hon. Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts

